**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINA**

| | |
|---|---|
| GLENDA KOVACH and AMY ADKINS, individually and as representatives of a Putative Class of Participants and Beneficiaries, on behalf of the LHC GROUP 401(K) PLAN, | Case No. 3:23-cv-00051 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| LHC GROUP, INC., LHC GROUP 401(k) COMMITTEE; MARCUS MACIP; JOSH PROFFITT; CHRIS GILL, KIMBERLY SEYMOUR; and DOES 1 through 10, | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION………………...…..…..………………………...……………..……..1

JURISDICTION AND VENUE………………..…..…..……………………...…..……3

THE PARTIES……………………………..……..…..………………...……………….4

    Plaintiffs………..…..…..…………………………………..……………………...4

    Defendants…………….....……………………………….……………………...5

    Parties in Interest…………………..……....…………….…………………….6

DEFENDANTS' FIDUCIARY OBLIGATIONS…..…………….…..……………………7

DEFINED CONTRIBUTION 401(K) PLANS AND THE IMPACT OF EXCESSIVE

FEES…………………………………………………………………………..8

THE ESTABLISHMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON

FOR THE COMPLAINT'S ALLEGATIONS………………….……………………10

FACTUAL ALLEGATIONS……………………..…..………..……………….......10

    A.    Defendants Paid Transamerica and Voya and other Covered Service Providers Unreasonable Fees, Failed to Monitor their Covered Service Providers, and make Requests for Proposals from Other Covered Service Providers……………………………….…………...…...................10

    B.    Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options………….…………..16

    C.    Defendants imprudently selected, offered and retained poorly performing managed funds within the Plan which failed to meet or exceed the returns of an appropriate benchmark, including the funds' own selected prospectus benchmark as identified by the funds and reported in the funds prospectuses.……………………………………………………25

D.    Defendants imprudently selected, offered and retained poorly performing managed funds within the Plan when indexed funds with identical investment goals and significantly lower fees were available resulting in participants / beneficiaries paying unnecessary costs and fees for services that provided no value to them and resulted in a reduction of compounded return gains……………………………………………………………………..31

E.    Defendants Imprudently Maintained the Plan's Investment in the Wilmington/MetLife Group Annuity Contract Stable Value Option, When Lower Share Classes Existed and Other Investment Vendor Offered Superior Alternatives……………………………………………………………………41

CLASS ACTION ALLEGATIONS…………………………………………………………..45

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence (Against All Defendants)……………………………………………………..…….……………....46

SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers (Against All Defendants)……………………………………..…………………………...…..48

PRAYER FOR RELIEF……………………………………………………….…..50

## CLASS ACTION COMPLAINT

Plaintiffs Glenda Kovach and Amy Adkins (collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the LHC GROUP 401(K) PLAN, (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, on behalf of the Plan against current Plan sponsor, LHC GROUP, INC. ("LHC Group"), the named fiduciary LHC GROUP 401(K) COMMITTEE ("Plan Committee"), Chris Gill, Josh Profitt, Marcus Macip, Kimberly Seymour and John Does 1-10 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1.      This action is brought by current and former employees / participants / beneficiaries of Defendants' Plan to recover losses due to mismanagement of the 401k retirement plan and certain selected funds.  The 401k plan has become the dominant source of retirement savings for most Americans.  Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers. This action is filed to recover millions of dollars of funds owed back to the plan on behalf of employees / participants / beneficiaries.  These retirement funds are significant to the welfare of the class.

2.      Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment.  To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et. seq.* ("ERISA").

3.      The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits.  However, Defendants have not followed ERISA's standard of care.  This lawsuit is filed after careful consultation with experts and review of publicly available documents to return benefits taken from Plan participants by Defendants.

4.      The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.  As of December 31, 2021, the Plan had 28,760 total participants and $466,024,031 in assets.

5.      ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1).  A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*.  A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

6.      Specifically, Defendants breached their fiduciary duties of prudence and loyalty to the Plan by:

a.  Offering and maintaining funds with higher-cost share classes when identical lower cost class shares were available and could have been offered to participants resulting in participants/beneficiaries paying unnecessary costs for services that provided no value to them and resulted in a reduction of compounded return gains;

b.  Selecting, Offering and Retaining poorly performing actively managed funds within the Plan which failed to meet or exceed the funds' own selected primary prospectus benchmark as identified by the fund and reported in the fund prospectus to the SEC, or other applicable benchmarks.

c.  Selecting, Offering and Retaining poorly performing actively managed funds within the Plan when indexed funds with the same investment goals, invest from the same pool of

stocks or bonds and charge significantly lower fees were available, which resulted in participants / beneficiaries paying unnecessary fees for services that not only provided no value to them but also resulted in financial harm through a reduction of compounded return gains.

d.  Offering a guaranteed income product that had unnecessarily high risk and low returns and offering an expensive share class of that product;

e.  Through the excessive costs and investment in expensive funds, depriving participants of compounded returns which greatly exceed the annual cost of fees and revenue sharing;

and

f.  Failing to maintain and restore trust assets.

7.      Plaintiffs were injured during the Relevant Time Period by the Defendants' flawed processes in breach of their fiduciary duties.   As a result of Defendant's actions, participants invested in subpar investment vehicles and paid additional unnecessary operating expenses and fees with no value to the participants and resulting in a loss of compounded returns.

8.      Plaintiffs, individually and as the representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.      Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

10.     Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2).

11.     The Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

13.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, one or more Plaintiffs reside and were employed in this District, and because ERISA provides for nationwide service of process.

14.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because many violations of ERISA took place in this District, and Defendants conduct business in this District and reside or may be found in this district. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiffs were employed in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## **THE PARTIES**

### *Plaintiffs*

15.     Plaintiff Glenda Kovach resides in Fairmont West Virginia, and was an employee of LHC Group, Inc and worked for LHC Group, Inc in Huntington, West Virgina. Kovach was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in the some or all of the funds which are at issue in this action. Kovach was damaged by the Defendants' breaches of their fiduciary duties impacted the Plan as a whole and damaged all Plan participants.

4

16.     Plaintiff Amy Adkins resides in South Point, Ohio, and was an employee of LHC Group, Inc, and worked for Defendants in Huntington, West Virginia.  Adkins was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.   Adkins was damaged by the Defendants' breaches of their fiduciary duties impacted the Plan as a whole and damaged all Plan participants.

17.     Kovach and Adkins (Plaintiffs) have standing under 29 U.S.C. § 1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless and insouciant actions caused actual harm to an ERISA plan in which the Plaintiffs participate. Plaintiffs suffered an injury in fact by, *inter alia*, investing in the higher cost mutual fund shares when lower cost shares of the same fund were available to the Plan, being forced into high expense investments because lower choice investments were not made available, being deprived of a high quality, reasonably priced and secure stable value investment option, and being offered funds which failed to perform at or above its chosen and/or applicable benchmark. Defendants are liable to the Plan for the Plan's losses under 29 U.S.C. § 1109(a).

### Defendants

18.     Defendant LHC GROUP, INC. ("LHC Group") is the current sponsor and administrator of the Plan and maintains its principal place of business at 901 Hugh Wallis Road South, Lafayette, LA 70508.  LHC Group is registered with the State of West Virginia, and upon information and belief, operates as a sponsor and administrator and/or fiduciary of the Plan.

19.     Defendant LHC GROUP 401(K) COMMITTEE ("Committee" or "Investment Committee") is composed of a group of fiduciaries of the plan tasked with selecting and maintaining investments and service providers that are in the best interests of the plan participants and beneficiaries.

20.     Defendant Marcus Macip is a Named Fiduciary pursuant to the Trust Agreement dated May 31, 2019 entered pursuant to IRC 401(1) Trust Agreement – ERISA Plan.

21.    Defendant Josh Proffitt is a Named Fiduciary pursuant to the Trust Agreement dated May 31, 2019 entered pursuant to IRC 401(1) Trust Agreement – ERISA Plan.

22.    Defendant Chris Gill is a Named Fiduciary and member of the LHC Group 401k Committee, and signatory of LHC Group 401k Plan form IRS 5500.

23.    Defendant Kimberly Seymour is a Named Fiduciary and member of the LHC Group 401k Committee pursuant to the 401(k) Committee Unanimous Written Consent Document.

24.    Defendant "Does" or the names of the individuals on the Board of Directors and related Committee(s), including the Plan's Investment Committee, as well as the Plan's manager, and LHC Group's officers during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through amendment to this Complaint.

25.    LHC Group, the Board of Directors, the Plan Investment Committee, the Plan's manager, and the Directors and Officers are fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

***Parties in Interest***

26.    Finally, although not currently named as Defendants, the covered service providers serve as "Parties of Interest" to this Litigation.

27.    LHC Group contracted with ALLIANT RETIREMENT SERVICES ("Alliant"), to serve as the Plan's Investment Advisor.  Alliant served as investment fiduciary during the relevant time period based on Schedules C certified returns filed by LHC Group.

28.    LHC Group contracted with TRANSAMERICA RETIREMENT SOLUTIONS ("Transamerica") to serve as the Plan's recordkeeper and Trustee.  In this capacity, Transamerica

received and held the assets of the Fund on behalf of the Participants and Beneficiaries. Transamerica served as investment fiduciary during the relevant time period based on Schedules C certified returns filed by LHC Group.

29.     In or around 2019, LHC Group contracted with VOYA INSTITUTIONAL PLAN SERVICES ("Voya"), to replace Transamerica as the Plan's recordkeeper and Trustee.  In this capacity, Voya received and held the assets of the Fund on behalf of the Participants and Beneficiaries. Voya served as an investment advisor to the participants during the relevant time period based on Schedules C certified returns filed by LHC Group.

30.     LHC Group and the Plan Committee had a concomitant fiduciary duty to monitor and supervise those appointees and contracted parties.

## **DEFENDANTS' FIDUCIARY OBLIGATIONS**

31.     Under ERISA, a fiduciary's duty is akin to the duty of a trust fiduciary.  *Tibble v. Edison Intern*., 575 U.S. 523, 528-29.

32.     To state an ERISA claim for a breach of a fiduciary duty, a "plaintiff must make a prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan." *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 594.

33.     ERISA and common law trusts impose strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

34.     29 U.S.C. §1104(a)(1)(B) and common law requires a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

35.     A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. at 1829.

36.     29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allow a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." Transamerica, Voya and Alliant are "parties in interest" under 29 U.S.C. §1106(a)(1)(C).

37.     29 U.S.C. §1132(a)(2) and common law authorize a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

38.     Section 1109(a) and common law provides "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959); *see Eaves v. Penn*, 587 F.2d at 463.

## DEFINED CONTRIBUTION 401(K) PLANS AND THE IMPACT OF EXCESSIVE FEES

39.     In a defined contribution plan, participants (and sometimes their employer) make contributions to plan participants' individual accounts.  Participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus any investment gains less plan and investment expenses.  *See* 29 U.S.C. § 1002(34). Plan Participants' investments are held in trust.  Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

40.     Because retirement savings in defined contribution plans are intended to grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire.  Over time, even small differences in fees and performance compound and can

result in vast differences in the amount of savings available at retirement.  As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825.  In short, the damages caused by breaches of fiduciary duties to the Plan cause damages that continue to accrue and compound over time.

41.     In fact, the impact of excessive fees on employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[1]

42.     "As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time.

43.      Accordingly, courts have recognized that plan fiduciaries "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016).

44.     The marketplace for retirement plan services is established and competitive. As of December 31, 2021, the Plan had 15,266 participants with account balances and $466,024,031 in assets. As a result, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds.

---

[1] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

## THE ESTABLISHEMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

45.     The Defendants' Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and available for download from www.efast.dol.gov for forms filed in 2010 and onward).

46.     The underlying allegations in this Complaint are based on the limited documents provided by Defendants, Plaintiffs' documents, as well as the Defendants' past Forms 5500 filed with U.S. Departments of Treasury and Labor found at www.efast.dol.gov, and mutual fund prospectuses found at https://www.sec.gov/edgar/searchedgar.

## FACTUAL ALLEGATIONS

**A.     Defendants Paid Transamerica and Voya and other Covered Service Providers Unreasonable Fees, Failed to Monitor their Covered Service Providers, and make Requests for Proposals from Other Covered Service Providers.**

47.     Defendants have a duty to prudently select covered service providers ("CSPs"). Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation.  Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[2] The DOL has observed that, when selecting a service provider, "the responsible plan fiduciary must engage in an objective process." *Id*. Such a process must be "designed to elicit information necessary to assess . . . the reasonableness of the fees charged in light of the services provided." *Id*.

48.     Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

---

[2] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

49.     The cost of recordkeeping and administrative services depends on the number of participants, not the amount of assets in the participant's account.

50.     The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is for upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

51.     Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

52.     Recordkeepers for defined contribution plans are generally compensated in two ways: First, through direct payments from the plan (participants) or employer; and second, through indirect payments via a practice known as revenue sharing.

53.     In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include: Rule 12b-1 fees, which are paid by the Funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of Fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper for services rendered.

54.     Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per

participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids.  Defendants did not do that here.

55.     Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable recordkeeping fees. To put it another way, recordkeepers (or any other CSP) receiving unchecked revenue sharing compensation accrue significant ongoing pay increases simply as a result of participants putting money aside biweekly for retirement. Additional funds come from interest, dividends and capital gains.

56.     Thus, for example, in 2019, based on information in the Plan's Form 5500, the Plan paid Voya and Transamerica a combined approximately $1,074,734.  In 2020, that number grew to 1,869,992, and in 2021, it grew to 2,596,126.  Across the same years, the number of participants with account balances actually decreased slightly from 15,517 to 15,266. In effect, the cost to recordkeep each participant account exploded by $100 per participant simply because the asset base grew.

57.     Moreover, the insidious nature of Voya's compensation structure is that participants pay direct compensation of 0.25% which they would likely see on their statements and would believe represented their share of the total recordkeeping costs, however, the indirect (revenue sharing costs) were and are unseen and unknown by the participants even as those indirect fees have spiked.

58.     Indeed, as shown below, the fees paid by plan participants continued to grow over time and surged after Voya replaced Transamerica as the Plan's recordkeeper, further underscoring the Defendants' failure to carry out their fiduciary duties to the Plan.



59.     This growth in direct and indirect fees paid out by the Plan did not correlate to increased service.  Rather, the Plan Assets increased significantly causing additional revenue sharing fees to be generated.

60.     A comparison of Plan recordkeeping fees to other comparable Plans with similar numbers of employees and assets and similar services offered reveals that the estimated service provider fees for the Plan were far in excess of reasonable fees.

**Table 1**

| Total Plan Assets | Participants w/ Account Balances | Plan Sponsor Name | Cost per Participant w/ Balances |
|---|---|---|---|
| $307,524,414 | 6,154 | AISIN HOLDINGS OF AMERICA INC | $31.39 |
| $414,508,108 | 11,576 | CARGILL INCORPORATED | $33.05 |
| $412,344,347 | 4,734 | THE WONDERFUL COMPANY LLC | $36.85 |
| $493,950,650 | 7,597 | PACIFIC ARCHITECTS AND ENGINEERS LLC | $45.04 |
| $102,808,438 | 3,418 | HEALTH PRO MANAGEMENT SERVICES LLC | $51.91 |
| $359,228,201 | 13,633 | CORECIVIC OF TENNESSEE LLC | $53.72 |
| $283,521,695 | 4,668 | DELAWARE NORTH COMPANIES INCORPORATED | $58.66 |
| $349,925,092 | 11,494 | SEQUOIA ONE PEO LLC | $58.88 |
| $213,044,705 | 6,651 | ASPLUNDH TREE EXPERT LLC | $58.93 |
| $104,656,517 | 4,239 | FC COMPASSUS LLC | $62.07 |
| $352,176,478 | 5,398 | CHENEGA CORPORATION | $67.80 |
| $216,915,911 | 4,878 | LOEWS HOTELS HOLDING CORPORATION | $68.48 |

13

| $245,535,230 | 8,926 | STATION CASINOS LLC | $72.13 |
|---|---|---|---|
| $243,881,856 | 5,446 | ASPEN DENTAL MANAGEMENT INC | $74.88 |
| $208,858,603 | 1,402 | NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING | $78.42 |
| $465,899,924 | 11,002 | FOSTER POULTRY FARMS | $83.20 |
| $358,517,645 | 6,700 | BRISTOL BAY NATIVE CORPORATION | $83.33 |
| $512,164,478 | 7,556 | ROPER ST FRANCIS HEALTHCARE | $92.21 |
| $194,935,020 | 3,770 | LCS HOLDINGS INC | $93.73 |
| $307,736,713 | 13,296 | PACIFIC DENTAL SERVICES LLC | $101.00 |
| $304,164,664 | 8,185 | VENSURE EMPLOYER SERVICES INC | $112.91 |
| $252,927,227 | 8,641 | BAYADA HOME HEALTH CARE INC | $116.34 |
| $143,321,644 | 4,546 | HELPSIDE INC | $120.33 |
| $255,942,840 | 5,968 | OREGON - COLUMBIA CHAPTER AGC | $129.16 |
| **$466,794,632** | **15,266** | **LHC GROUP INC** | **$192.91** |

61.     There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to the Plan, and who will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

62.     The package of recordkeeping services the Plan received included standard recordkeeping services such as: government reporting services, plan sponsor support services, recordkeeping services, and plan investment services and reporting.

63.     The Plan did not receive any unique services or at a level of quality that would warrant fees greater than the competitive fees that would be offered by other providers.

64.     The market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like LHC's with large numbers of participants and large amounts of assets.

65.     The unreasonable fees paid to covered service providers through  revenue sharing arrangements directly resulted from Defendants' choice to utilize improper mutual fund share classes and failing to monitor the providers.

66.     The mutual funds paid annual revenue sharing fees based on a percentage of the total Plan assets invested in the fund, which were ultimately paid by Plan participants who invested in those funds. The Plan participants realized immediate lower returns each day on their investments because they paid higher fund operating expenses.

14

67.    The clear explanation for this is that Defendants have a flawed and reckless provider selection process that is "tainted by failure of effort, competence, or loyalty." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

68.    As discussed below, in most years, many of the funds offered to the participants had less expensive share classes available.  Defendant's use of higher cost share classes to pay service provider costs is the most inequitable, inefficient and expensive method available.

69.    Defendants clearly failed to use the Plan's bargaining power to leverage its CSPs to charge lower administrative fees for the Plan participants.

70.    Defendants failed to take any or adequate action to monitor, evaluate or reduce their service provider fees, such as:

   a.  Choosing mutual fund share classes with lower revenue sharing for the Plan;
   b.  monitoring costs to compare with the costs being charged for similar sized plans in the marketplace; or
   c.  negotiating to cap the amount of revenue sharing or ensure that any excessive amounts were returned to the Plan.

71.    The amount of compensation paid to CSPs vastly exceeds any DOL and IRS prohibited transaction "reasonable compensation" exemption for "cost plus reasonable profit."

72.    In sum, the Plan unreasonably paid Transamerica and Voya fees far in excess of what the Plan needed to pay for their services and these fees were not tethered to the actual services rendered, but rather increased based on revenue sharing of a larger corpus of Plan funds over time.

73.    ERISA holds fiduciaries "to a high standard of care and diligence" regarding fees: Fiduciaries must, among other things, "[e]stablish a prudent process for selecting investment options and service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor investment options and service providers once selected to make sure they continue to be appropriate choices." Additionally, The Department of Labor has consistently reminded ERISA fiduciaries of their responsibilities to carefully evaluate fees when selecting plan investment

options and then monitor fees on an ongoing basis.  Defendants breached their fiduciary duties by failing to conduct themselves accordingly.

**B.      Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options.**

74.      While a fiduciary is not required to "scour the market to find and offer the cheapest possible fund," selecting higher-cost funds where other options exist can give rise to the inference "that the process was flawed," demonstrating imprudence. *Hecker v. Deere & Co*., 556 F.3d 575, 586 (7th Cir. 2009); *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 595-96 (8th Cir. 2009), (inferring mismanagement and the possibility that the defendant "failed to pay close enough attention to available lower-cost alternatives," where less expensive funds were available).

75.      As described below, Defendants invested Plan funds in high-cost mutual fund share classes when lower cost share classes were available that were identical to the funds chosen, but for their cost.

76.      Further the flawed fiduciary process employed by Defendants resulted in the selection of high-cost funds, and those funds performed poorly relative to their applicable benchmarks and necessarily relative to their lower cost share options.

77.      Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

78.       Mutual funds often offer multiple "classes" of their shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge different operating expenses depending on the class.

79.      A mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund to one share class, while charging a lower cost share class of that same fund an expense ratio of .50%.  Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases

the share class with the higher operating expense. While the annual return may more closely reflect the difference in share class costs, over time the difference in returns begins to deviate significantly from the original expenses due to cumulative annual costs and lost compounding. Generally, lower cost share classes are available to larger investors, such as 401(k) plans like the Plan.

80.     Plans that invest their participants' funds in lower share classes and subject them to higher fees engage in share class violations which are the most clear and obvious breaches of fiduciary duties in the Plan. *See Tibble v. Edison*, 2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017) ("Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.").

81.     Since at least 2016 and throughout the limitations period, Defendants offered higher cost mutual fund share classes as investment options for the Plan even though at all times lower cost class shares of those exact same mutual funds were readily available to the Plan.

82.      Indeed, Defendants have provided as many as 28 fund choices with clear share class violations, with at least 81% of all share classes in the period, and as high as 100% of share classes in the period, violating the fiduciary duty to select the lowest cost share class of the funds. See Summary Table by year below.

**Table 2**

|                                   | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 |
|-----------------------------------|------|------|------|------|------|------|
| Total Funds #                     | 29   | 29   | 27   | 29   | 26   | 26   |
| Cheaper Shares Classes Available # | 24   | 24   | 22   | 28   | 26   | 26   |
| Cheaper Shares Classes Available % | 83%  | 83%  | 81%  | 97%  | 100% | 100% |

83.      Of the 24-26 investment options for which lower-cost share classes were available, the less expensive options were the better options. Defendants' failure to select those options raises the inference of imprudence. *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 588.

84.     The following chart illustrates the differences in the operating costs and Returns (performance) between the share classes chosen by Defendants and the least expensive share class available as of January 1, 2017.

17

85.     The fund name listed in the first row and shaded grey represents the share class chosen by Defendants.  The second fund name listed and not shaded represents the cheaper share class Defendants should have chosen which was available to them throughout the duration of the Plan.  The bolded line represents the difference in costs (expenses charged), 12-month yield and the investment returns for the one- and annualized three- and five-year – and six-year performance periods ending 12/31/2022.

86.     Additionally, to highlight the harm caused by the Defendants' imprudent selection of high-cost share classes, the three-, five- and six-year cumulative returns are included, which shows the compounding effect of excess fees paid over the course of each year.

**Table 3**

| Name | Expense Ratio % | 1-Year % | Cumulative Total Returns (Ending 12/31/22) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 3-Year Total | 3-Year % / 3* | 5-Year Total | 5-Year % / 5* | 6-Year Total | 6-Year % / 6* |
| Hartford Core Equity R4[1] | 0.76 | -18.94 | 18.83 | | - | | - | |
| Hartford Core Equity R6 | 0.36 | -18.65 | 20.13 | | - | | - | |
| *Cost of Expensive Share Classes* | *-0.40* | *-0.29* | *-1.29* | *-0.43* | | | | |
| MFS Growth R3 | 0.84 | -31.32 | 11.21 | | 56.31 | | 104.02 | |
| MFS Growth R6 | 0.49 | -31.08 | 12.36 | | 59.01 | | 108.28 | |
| *Cost of Expensive Share Classes* | *-0.35* | *-0.24* | *-1.15* | *-0.38* | *-2.70* | *-0.54* | *-4.26* | *-0.71* |
| JPMorgan Equity Income R3[1] | 0.95 | -2.12 | 26.26 | | - | | - | |
| JPMorgan Equity Income R6 | 0.45 | -1.64 | 28.17 | | - | | - | |
| *Cost of Expensive Share Classes* | *-0.50* | *-0.48* | *-1.91* | *-0.64* | | | | |
| Hartford MidCap R4 | 1.15 | -24.39 | 3.15 | | 25.95 | | 56.08 | |
| Hartford MidCap R6 | 0.73 | -24.08 | 4.41 | | 28.50 | | 59.88 | |
| *Cost of Expensive Share Classes* | *-0.42* | *-0.31* | *-1.26* | *-0.42* | *-2.55* | *-0.51* | *-3.80* | *-0.63* |

18

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Victory Sycamore Established Value A | 0.90 | -2.82 | 37.73 | | 58.70 | | 83.56 | |
| Victory Sycamore Established Value R6 | 0.54 | -2.48 | 39.18 | | 61.45 | | 87.41 | |
| *Cost of Expensive Share Classes* | *-0.36* | *-0.34* | *-1.44* | *-0.48* | *-2.75* | *-0.55* | *-3.86* | *-0.64* |
| Loomis Sayles Small Cap Growth Retail | 1.17 | 9.78 | 85.34 | | 135.10 | | 147.93 | |
| Loomis Sayles Small Cap Growth N | 0.82 | 10.19 | 87.37 | | 139.45 | | 153.46 | |
| *Cost of Expensive Share Classes* | *-0.35* | *-0.41* | *-2.03* | *-0.68* | *-4.35* | *-0.87* | *-5.53* | *-0.92* |
| Victory Sycamore Small Company Opp A | 1.25 | -6.91 | 21.59 | | 40.68 | | 56.83 | |
| Victory Sycamore Small Company Opp R6 | 0.85 | -6.52 | 23.06 | | 43.43 | | 60.46 | |
| *Cost of Expensive Share Classes* | *-0.40* | *-0.39* | *-1.47* | *-0.49* | *-2.75* | *-0.55* | *-3.64* | *-0.61* |
| ClearBridge International Growth A[1] | 1.06 | -21.39 | 1.54 | | - | | - | |
| ClearBridge International Growth IS | 0.69 | -21.11 | 2.67 | | - | | - | |
| *Cost of Expensive Share Classes* | *-0.37* | *-0.28* | *-1.13* | *-0.38* | | | | |
| Invesco Developing Markets A[1] | 1.20 | -25.16 | -18.85 | | | | | |
| Invesco Developing Markets R6 | 0.81 | -24.85 | -17.88 | | | | | |
| *Cost of Expensive Share Classes* | *-0.39* | *-0.31* | *-0.97* | *-0.32* | | | | |
| American Funds New Perspective R4[2] | 0.76 | -25.87 | 16.33 | | 42.35 | | 83.37 | |
| American Funds New Perspective R6 | 0.41 | -25.61 | 17.55 | | 44.84 | | 87.28 | |
| *Cost of Expensive Share Classes* | *-0.35* | *-0.26* | *-1.21* | *-0.40* | *-2.50* | *-0.50* | *-3.90* | *-0.65* |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cohen & Steers Real Estate Securities A[1] | 1.10 | -26.49 | 2.06 | | - | | - | |
| Cohen & Steers Real Estate Securities Z | 0.75 | -26.23 | 3.15 | | - | | - | |
| *Cost of Expensive Share Classes* | *-0.35* | *-0.26* | *-1.09* | *-0.36* | | | | |
| PGIM Total Return Bond A[1] | 0.76 | -15.15 | -9.99 | | -1.33 | | 4.91 | |
| PGIM Total Return Bond R6 | 0.39 | -14.88 | -9.04 | | 0.45 | | 7.18 | |
| *Cost of Expensive Share Classes* | *-0.37* | *-0.27* | *-0.96* | *-0.32* | *-1.78* | *-0.36* | *-2.27* | *-0.38* |
| Lord Abbett Bond Debenture R4[1] | 0.81 | -12.70 | -3.22 | | - | | - | |
| Lord Abbett Bond Debenture R6 | 0.49 | -12.49 | -2.24 | | - | | - | |
| *Cost of Expensive Share Classes* | *-0.32* | *-0.21* | *-0.98* | *-0.33* | | | | |
| American Funds American Balanced R4[1] | 0.60 | -12.14 | 12.70 | | 30.56 | | 50.70 | |
| American Funds American Balanced R6 | 0.25 | -11.83 | 13.87 | | 32.83 | | 53.88 | |
| *Cost of Expensive Share Classes* | *-0.35* | *-0.31* | *-1.17* | *-0.39* | *-2.28* | *-0.46* | *-3.18* | *-0.53* |
| BlackRock LifePath® Index Retire Inv A[1] | 0.39 | -15.48 | 0.74 | | - | | - | |
| BlackRock LifePath® Index Retire K | 0.09 | -15.20 | 1.75 | | - | | - | |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.28* | *-1.02* | *-0.34* | | | | |
| BlackRock LifePath® Index 2025 Inv A[1] | 0.39 | -16.01 | 2.28 | | - | | - | |
| BlackRock LifePath® Index 2025 K | 0.09 | -15.77 | 3.16 | | - | | - | |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.24* | *-0.88* | *-0.29* | | | | |
| BlackRock LifePath® Index 2030 Inv A[1] | 0.39 | -16.71 | 4.31 | | - | | - | |

| | | | | | |
|---|---|---|---|---|---|
| BlackRock LifePath® Index 2030 K | 0.09 | -16.41 | 5.28 | | - | - |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.30* | *-0.97* | *-0.32* | |
| BlackRock LifePath® Index 2035 Inv A[1] | 0.39 | -17.27 | 6.38 | | - | - |
| BlackRock LifePath® Index 2035 K | 0.09 | -17.07 | 7.36 | | - | - |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.19* | *-0.98* | *-0.33* | |
| BlackRock LifePath® Index 2040 Inv A[1] | 0.39 | -17.90 | 8.05 | | - | - |
| BlackRock LifePath® Index 2040 K | 0.09 | -17.65 | 9.04 | | - | - |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.25* | *-0.99* | *-0.33* | |
| BlackRock LifePath® Index 2045 Inv A[1] | 0.39 | -18.31 | 9.70 | | - | - |
| BlackRock LifePath® Index 2045 K | 0.09 | -18.05 | 10.69 | | - | - |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.26* | *-0.99* | *-0.33* | |
| BlackRock LifePath® Index 2050 Inv A[1] | 0.39 | -18.54 | 10.58 | | - | - |
| BlackRock LifePath® Index 2050 K | 0.09 | -18.33 | 11.57 | | - | - |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.22* | *-0.99* | *-0.33* | |
| BlackRock LifePath® Index 2055 Inv A[1] | 0.39 | -18.59 | 10.68 | | - | - |
| BlackRock LifePath® Index 2055 K | 0.09 | -18.33 | 11.67 | | - | - |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.26* | *-0.99* | *-0.33* | |

21

| | | | | |
|---|---|---|---|---|
| BlackRock LifePath® Index 2060 Inv A[1] | 0.39 | -18.58 | 10.68 | - | - |
| BlackRock LifePath® Index 2060 K | 0.09 | -18.32 | 11.64 | - | - |
| *Cost of Expensive Share Classes* | *-0.30* | *-0.25* | *-0.96* | *-0.32* | |

\* The 3-Year %/3 and 5-Year %/5 figures illustrate that the cost to participants in lost returns is typically greater than the charged annual expenses. This lost return differential is not adequately expressed in the annualized figures.  The exclusion of any fund from this chart is not meant to exclude it from the share class allegations in the Complaint. Plaintiffs contend that the Plan should have invested in the cheapest available share class for all funds.

87.     Even without considering the compounding losses, the losses based on expensive share classes are high.  For example, the BlackRock LifePath Target Date funds have only been in the Plan since 2019 but have already cost the Plan over $750,000 in excess fees because Defendants invested in an expensive share class.

**Table 4**

| Expensive Share Class in Plan | Expense Ratio % | Least Expensive Share Class Alternative | Expense Ratio % | Cost to Plan |
|---|---|---|---|---|
| BlackRock LifePath Index Retire Inv A | 0.39 | BlackRock LifePath® Index Retire K | 0.09 | ($50,203.59) |
| BlackRock LifePath Index 2025 Inv A | 0.39 | BlackRock LifePath® Index 2025 K | 0.09 | ($189,893.47) |
| BlackRock LifePath Index 2030 Inv A | 0.39 | BlackRock LifePath® Index 2030 K | 0.09 | ($209,899.67) |
| BlackRock LifePath Index 2035 Inv A | 0.39 | BlackRock LifePath® Index 2035 K | 0.09 | ($254,129.98) |
| BlackRock LifePath Index 2040 Inv A | 0.39 | BlackRock LifePath® Index 2040 K | 0.09 | ($223,414.89) |
| BlackRock LifePath Index 2045 Inv A | 0.39 | BlackRock LifePath® Index 2045 K | 0.09 | ($219,132.90) |
| BlackRock LifePath Index 2050 Inv A | 0.39 | BlackRock LifePath® Index 2050 K | 0.09 | ($171,397.57) |
| BlackRock LifePath Index 2055 Inv A | 0.39 | BlackRock LifePath® Index 2055 K | 0.09 | ($68,052.95) |
| BlackRock LifePath Index 2060 Inv A | 0.39 | BlackRock LifePath® Index 2060 K | 0.09 | ($8,171.24) |

88.     Defendants may seek to explain that they offered higher cost share classes with higher fee burdens by pointing to the Plan's ability to use those fees for to defray service provider costs.  This explanation does not justify the increased fees and lost returns imposed on Plan participants.  Rather, empirically speaking, revenue sharing burdens on mutual fund investors are *always* more costly over time than the revenue sharing credit offered by the corresponding mutual fund share class.

89.     Investing Plan assets in higher cost share classes harms plan participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but rather are tied to the amounts invested by Plan participants.

90.     Moreover, Plan participants are generally not aware of the fee burden that their 401k accounts bear from indirect fees. Unlike direct fees, which are clearly listed on participants' statements, indirect fees are unshown and unknown to those paying those costs.

91.     Additionally, the indirect fees charged by each mutual fund company vary. According to the 2019 408(b)(2) fee disclosure notice, total revenue to Voya ranged from 0% to 0.5%. As a result of this inequality, some participants pay disproportionately more for plan costs than others simply based on which investment options they selected.

92.     Because the Plan could have invested in identical mutual funds with a lower cost share class, the Defendants' actions were directly erosive to the trust's growth.

93.     Defendants thus caused Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of those higher fees on nearly every mutual fund offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments.

94.     In selecting share classes with higher fees, Defendants demonstrated a lack of basic skill and prudence when selecting investments.

95.     Defendants failed to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants.

96.     Lastly, the information available for Defendants to make an informed assessment as to costs and returns available for each share class and to make the assessments noted above was made available in each fund's annual prospectus at the time the choices were made.

97.     For example, Defendants have included the MFS Growth R3 as an investment option available to participants since 2016. The information provided in the MFS Growth annual prospectuses clearly show a significant difference in fees and investment returns between the Class R3 and the Class R6 Share Class (R5 at the time of selection and subsequently relabeled R6).   The R3 Class and R6 Class have the identical interest in the mutual fund's portfolio, but the expense ratio costs are 0.35% higher in the R3 Class, just as they were at the time of selection.

98.      The Defendants' actions to choose high-cost *index* funds demonstrates a lack of prudence.  At the time of selection, the MFS Growth R3 had the identical and less expensive R4 share class (subsequently relabeled R6).  The Class R3 fund available to participants currently pay 84 basis points (0.84%), as compared to 49 basis points (0.49%) with the Class R6 shares therefore requiring participants to pay a 71% higher expense ratio for the same exact investment.  As of December 31, 2021, MFS Growth R3 held $33,700,066 in participant assets, resulting in $117,950 in overcharges for the year 2021 alone.

99.     The Defendants' actions to choose high-cost *index* funds demonstrates a lack of prudence.  Similar to the MFS example, BlackRock LifePath Index 2035 Inv A had an identical and less expensive Share Class, (BlackRock LifePath Index 2035 K).  The Inv A class available to participants paid 39 basis points (0.39%), compared to the K class's nine basis points (0.09%) thus requiring participants to pay a 333% higher expense ratio for the same exact investment.  The BlackRock LifePath Index 2035 Inv A fund as of December 31, 2021 possessed $42,842,562 in assets, resulting in $128,527 in overcharges for the year 2021 alone.

Additionally, an analysis of each attribute of the different share classes reveals that there is <u>no</u> difference between the share classes other than costs and performance returns as a consequence of costs, all borne by the participants.

24

100.     Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs."  Uniform Prudent Investor Act (the "UPIA") §7.

101.     As is evident from the allegations in the Complaint, Defendants did not systemically and regularly review or institute other processes in place to fulfill their continuing obligation to monitor Plan investments and reduce Plan costs, or, in the alternative, failed to follow the processes, as evidenced by the offering of higher cost share classes as Plan investment options when lower cost options of the same funds were available.

102.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.   The total amount of excess mutual fund expenses paid by Plan participants over the past six years, which correspondingly reduced the return on the Plan participants' investments, resulted in millions of dollars of damages to participants.

**C.     Defendants imprudently selected, offered and retained poorly performing managed funds within the Plan which failed to meet or exceed the returns of an appropriate benchmark, including the funds' own selected prospectus benchmark as identified by the funds and reported in the funds prospectuses.**

103.     As required by the Securities and Exchange Commission (SEC) mutual funds file and maintain a Fund Prospectus.   The prospectus describes the mutual fund to prospective investors. Every mutual fund is required to file a prospectus. The prospectus contains information about the mutual fund's costs, investment objectives, risks, and performance.   All funds and variable contracts must provide investors with a prospectus. These are readily available on a government website located at https://www.sec.gov/edgar/searchedgar/prospectus.

104.     A prospectus contains important information about a fund's fees and expenses, investment objectives, investment strategies, risks, performance, pricing, and more.

105.    A prospectus also identifies the Fund's choice of indexed benchmark, or Primary Prospectus Benchmark (PPBM), for investors to use as a categorical comparison for fund performance.   The fund's actual performance can be measured against its chosen prospectus indices.

106.    In addition to the PPBM selected by the fund managers themselves, third parties may provide more appropriate comparators for each fund than the fund-selected comparator.

107.    Morningstar, Inc. ("Morningstar") is one such third party and a respected financial services company that provides research and analytics that are used throughout the asset management industry.

108.    In 1996, Morningstar created category classifications to help investors make meaningful comparisons between mutual funds.

109.    "Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested" and Morningstar "solved this problem by breaking portfolios into peer groups based on their holdings" which "help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios."[3]

110.    Per Morningstar,

[t]he driving principles behind the classification system are as follows:

- Individual portfolios within a category invest in similar types of securities and therefore share the same risk factors (for example, style risk, prepayment risk).
- Individual portfolios within a category can, in general, be expected to behave more similarly to one another than to portfolios outside the category.
- The aggregate performance of different categories differs materially over time.
- Categories have enough constituents to form the basis for reasonable peer group comparisons.
- The distinctions between categories are meaningful to investors and assist in their pursuit of investing goals.[4]

---

3 http://morningstardirect.morningstar.com/clientcomm/morningstar_categories_us_april_2016.pdf
4 *Id.*

111.    Critically, Morningstar determined that funds may select broad-based market comparators as their primary benchmark and that the funds may reflect a "low degree of correlation" with the corresponding benchmark.[5]

112.    In order to provide a better measure of fund performance, Morningstar publishes data on each fund's performance compared to Morningstar selected benchmarks.

113.    First, the Morningstar Category Index ("MCI") is a category-specific index that allows investors and advisors to compare fund performance to benchmarks that may be a better fit to the true makeup of a fund than the fund-selected PPBM.

114.    MCIs are commonly used as comparators in investment selection, monitoring and reporting tools used by investment managers and 401(k) investment committees.   MCI comparisons can be beneficial because they typically represent the weighted returns of the vast majority of investments within a specific asset-class (i.e. large-cap growth or small-cap value) which allows those selecting and monitoring investments to better identify risk and return derivations between the mutual funds they are reviewing.

115.    Second, Morningstar selects a Best-Fit Index ("BFI") for each fund based on the composition of the fund over the prior 36-month period.[6]  Because the BFI is selected because it reflects the highest correlation of the potential pool of benchmarks, comparison of a fund to its BFI makes it easier to determine how much of a fund's movements are based on the movements of the index, the relative level of risk a portfolio manager is taking, and ultimately whether a portfolio manager is adding value.

116.    The MCI and BFI are strong comparators and useful tools for evaluating fund performance because portfolio managers of funds within the same asset classes generally make buy and sell decisions based on the same pool of investments (stocks and/or bonds). These benchmarks help investors determine whether a specific portfolio manager has the skill to

---

[5] https://www.morningstar.com/articles/372237/understanding-best-fit-versus-standard-indexes
[6] *Id.*

determine, within that pool, how much to over/underweight certain investments and when to buy and sell.

117.    When evaluating fund performance, a prudent fiduciary considers data on a fund's performance against all relevant benchmarks including its MCI and BFI when evaluating fund performance because those comparators evaluate whether the fund is performing well based on the actual purpose and design of the fund.

118.    Here, as demonstrated in the charts below, many of the funds offered by the Plan showed poor performance during the statutory period as compared to their PPBM, MCI, and BFI.

119.    Further, the funds have not performed well against these benchmarks since the time of selection of the fund for inclusion in the Plan, even if that pre-dated the Class Period – reflecting longer term underperformance.

**Table 5**

**LHC Group Challenged Funds' Cumulative Returns vs Prospectus Benchmark**

| Year Selected | Last Full Year in the Plan | Fund Name | +/- PPBM since Selection[1] | +/- PPBM during SOL Period[2] | Cost to Participants during SOL Period[3] |
|---|---|---|---|---|---|
| 2019 | in plan | Hartford Core Equity R4 | (5.52) | (5.52) | ($303,369.98) |
| 2012 | 2018 | Columbia Large Cap Index A | (7.17) | (1.07) | ($22,504.33) |
| 2014 | 2018 | Columbia Contrarian Core A | (10.05) | (5.60) | ($259,489.10) |
| 2016 | in plan | MFS Growth R3 | (25.99) | (15.01) | ($1,165,312.16) |
| 2016 | 2018 | Invesco Diversified Dividend R | (9.12) | (4.96) | ($315,292.17) |
| 2012 | 2018 | Columbia Mid Cap Index A | (6.90) | (1.06) | ($19,369.74) |
| 2020 | in plan | Invesco Developing Markets A^ | (10.99) | (10.99) | ($90,875.21) |
| 2018 | 2018 | American Century One Choice In Retire A | (1.86) | (1.86) | ($66,344.19) |
| 2012 | 2017 | American Century One Choice In Retire R | 8.44 | 1.04 | $33,113.01 |
| 2018 | 2018 | American Century One Choice 2025 A | (0.92) | (0.92) | ($106,589.98) |
| 2012 | 2017 | American Century One Choice 2025 R | (4.50) | (1.23) | ($113,543.51) |
| 2018 | 2018 | American Century One Choice 2030 A | (0.49) | (0.49) | ($64,146.08) |
| 2012 | 2017 | American Century One Choice 2030 R | (6.27) | (1.81) | ($180,456.60) |
| 2018 | 2018 | American Century One Choice 2035 A | (0.09) | (0.09) | ($13,680.85) |
| 2012 | 2017 | American Century One Choice 2035 R | (6.10) | (1.96) | ($211,063.15) |
| 2018 | 2018 | American Century One Choice 2040 A | 0.19 | 0.19 | $23,476.09 |

28

| 2012 | 2017 | American Century One Choice 2040 R | (6.20) | (2.23) | ($202,084.09) |
| 2018 | 2018 | American Century One Choice 2045 A | (0.09) | (0.09) | ($11,529.88) |
| 2012 | 2017 | American Century One Choice 2045 R | (5.10) | (1.55) | ($143,316.08) |
| 2018 | 2018 | American Century One Choice 2050 A | (0.35) | (0.35) | ($33,577.78) |
| 2012 | 2017 | American Century One Choice 2050 R | (6.66) | (1.16) | ($77,049.52) |
| 2018 | 2018 | American Century One Choice 2055 A | (0.62) | (0.62) | ($19,280.75) |
| 2012 | 2017 | American Century One Choice 2055 R | (7.44) | (1.04) | ($18,126.23) |
| 2018 | 2018 | American Century One Choice 2060 A | (0.71) | (0.71) | ($1,271.86) |
| 2016 | 2017 | American Century One Choice 2060 R | (4.69) | (1.34) | ($460.83) |

1) Since selection is based on year selected through the last full year held in the plan
2) Beginning period is 2017 or first year the fund was listed in the Form 5500 Schedule of assets, if later. Ending year based on last full year in the plan. SOL Period calculation estimated based on six-year period ending 12/31/22
3) Based on 2017 beginning year assets or the year the fund was added, if later.

## Table 6

**LHC Group Challenged Funds' Cumulative Returns vs Best Fit Index**

| Year Selected | Year Removed | Fund Name | +/- BFI since Selection[1] | +/- BFI during SOL Period[2] | Cost to Participants during SOL Period[3] |
|---|---|---|---|---|---|
| 2019 | in plan | Hartford Core Equity R4 | (5.52) | (5.52) | ($303,369.98) |
| 2012 | 2018 | Columbia Large Cap Index A | (7.17) | (1.07) | ($22,504.33) |
| 2014 | 2018 | Columbia Contrarian Core R3 | (10.05) | (5.60) | ($259,489.10) |
| 2016 | in plan | MFS Growth R3 | (2.79) | 3.63 | $281,817.66 |
| 2016 | 2018 | Invesco Diversified Dividend R | (9.12) | (4.96) | ($315,292.17) |
| 2012 | 2018 | Columbia Mid Cap Index A | (10.14) | (5.49) | ($100,320.64) |
| 2020 | in plan | Invesco Developing Markets A^ | (10.99) | (10.99) | ($90,875.21) |
| 2018 | 2018 | American Century One Choice In Retire A | 1.43 | 1.43 | $51,006.56 |
| 2012 | 2017 | American Century One Choice In Retire R | (36.26) | (7.01) | ($223,194.40) |
| 2018 | 2018 | American Century One Choice 2025 A | 0.64 | 0.64 | $74,149.55 |
| 2012 | 2017 | American Century One Choice 2025 R | (25.30) | (4.88) | ($450,481.58) |
| 2018 | 2018 | American Century One Choice 2030 A | 0.04 | 0.04 | $5,236.41 |
| 2012 | 2017 | American Century One Choice 2030 R | (19.00) | (3.64) | ($362,907.20) |
| 2018 | 2018 | American Century One Choice 2035 A | 0.48 | 0.48 | $72,964.51 |
| 2012 | 2017 | American Century One Choice 2035 R | (20.40) | (4.39) | ($472,738.38) |
| 2018 | 2018 | American Century One Choice 2040 A | 0.05 | 0.05 | $6,177.92 |
| 2012 | 2017 | American Century One Choice 2040 R | (13.56) | (3.03) | ($274,580.63) |
| 2018 | 2018 | American Century One Choice 2045 A | (0.57) | (0.57) | ($73,022.60) |
| 2012 | 2017 | American Century One Choice 2045 R | (7.36) | (1.61) | ($148,863.80) |
| 2018 | 2018 | American Century One Choice 2050 A | (1.07) | (1.07) | ($102,652.06) |
| 2012 | 2017 | American Century One Choice 2050 R | (4.92) | (0.13) | ($8,634.86) |

| Year Selected | Year Removed | Fund Name | | | |
|---|---|---|---|---|---|
| 2018 | 2018 | American Century One Choice 2055 A | (2.74) | (2.74) | ($85,208.47) |
| 2012 | 2017 | American Century One Choice 2055 R | (2.11) | 0.41 | $7,145.92 |
| 2018 | 2018 | American Century One Choice 2060 A | (2.91) | (2.91) | ($5,212.83) |
| 2016 | 2017 | American Century One Choice 2060 R | (0.93) | 0.66 | $226.97 |

1) Since selection is based on year selected through the last full year held in the plan
2) Beginning period is 2017 or first year the fund was listed in the Form 5500 Schedule of assets, if later. Ending year based on last full year in the plan. SOL Period calculation estimated based on six-year period ending 12/31/22
3) Based on 2017 beginning year assets or the year the fund was added, if later.

**Table 7**

**LHC Group Challenged Funds' Cumulative Returns vs Morningstar® Category Index**

| Year Selected | Year Removed | Fund Name | +/- MCI since Selection[1] | +/- MCI during SOL Period[2] | Cost to Participants during SOL Period[3] |
|---|---|---|---|---|---|
| 2019 | in plan | Hartford Core Equity R4 | (4.02) | (4.02) | ($220,932.49) |
| 2012 | 2018 | Columbia Large Cap Index A | (6.23) | (0.45) | ($9,464.44) |
| 2014 | 2018 | Columbia Contrarian Core A | (10.05) | (5.60) | ($259,489.10) |
| 2016 | in plan | MFS Growth R3 | (25.99) | (15.01) | ($1,165,312.16) |
| 2016 | 2018 | Invesco Diversified Dividend R | (9.12) | (4.96) | ($315,292.17) |
| 2012 | 2018 | Columbia Mid Cap Index A | (10.14) | (5.49) | ($100,320.64) |
| 2020 | in plan | Invesco Developing Markets A^ | (10.99) | (10.99) | ($90,875.21) |
| 2018 | 2018 | American Century One Choice In Retire A | (2.20) | (2.20) | ($78,471.62) |
| 2012 | 2017 | American Century One Choice In Retire R | 7.89 | 1.04 | $33,113.01 |
| 2018 | 2018 | American Century One Choice 2025 A | (0.28) | (0.28) | ($32,440.43) |
| 2012 | 2017 | American Century One Choice 2025 R | (14.70) | (2.83) | ($261,242.39) |
| 2018 | 2018 | American Century One Choice 2030 A | 0.04 | 0.04 | $5,236.41 |
| 2012 | 2017 | American Century One Choice 2030 R | (19.00) | (3.64) | ($362,907.20) |
| 2018 | 2018 | American Century One Choice 2035 A | 0.48 | 0.48 | $72,964.51 |
| 2012 | 2017 | American Century One Choice 2035 R | (20.40) | (4.39) | ($472,738.38) |
| 2018 | 2018 | American Century One Choice 2040 A | 0.89 | 0.89 | $109,966.93 |
| 2012 | 2017 | American Century One Choice 2040 R | (17.80) | (4.37) | ($396,012.33) |
| 2018 | 2018 | American Century One Choice 2045 A | 0.78 | 0.78 | $99,925.66 |
| 2012 | 2017 | American Century One Choice 2045 R | (12.44) | (3.62) | ($334,712.40) |
| 2018 | 2018 | American Century One Choice 2050 A | 0.52 | 0.52 | $49,886.98 |
| 2012 | 2017 | American Century One Choice 2050 R | (8.82) | (2.88) | ($191,295.36) |
| 2018 | 2018 | American Century One Choice 2055 A | 0.30 | 0.30 | $9,329.39 |
| 2012 | 2017 | American Century One Choice 2055 R | (5.09) | (2.51) | ($43,746.97) |

| 2018 | 2018 | American Century One Choice 2060 A | 0.25 | 0.25 | $447.84 |
| 2016 | 2017 | American Century One Choice 2060 R | (7.34) | (2.37) | ($815.04) |

1) Since selection is based on year selected through the last full year held in the plan
2) Beginning period is 2017 or first year the fund was listed in the Form 5500 Schedule of assets, if later. Ending year based on last full year in the plan. SOL Period calculation estimated based on six-year period ending 12/31/22
3) Based on 2017 beginning year assets or the year the fund was added, if later.

120.    A fiduciary has a continuing responsibility to "monitor investments and remove imprudent ones." *Tibble v. Edison Intern*., 575 U.S. 523, 530, 135 S.Ct. 1823, 191 L.Ed.2d 795 (2015).

121.    In particular, a fiduciary is charged with the continuous investigation of investments, where "the investments at issue were so plainly risky at the relevant times that an adequate investigation would have revealed their imprudence, or that a superior alternative investment was readily apparent." *Pension Benefit Guaranty Corp. v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 719 (2nd Cir. 2013).

122.    Defendants should have been aware of the continuous underperformance of the funds listed in the tables above, and removed those funds from the plan due to continuously underperforming their own chosen benchmarks and other industry standard benchmarks.

123.    Defendants breached their fiduciary duties by failing to use this data to make decisions in the best interests of the Plan participants, resulting in financial losses to the Plan participants.

**D.    Defendants imprudently selected, offered and retained poorly performing managed funds within the Plan when indexed funds with identical investment goals and significantly lower fees were available resulting in participants / beneficiaries paying unnecessary costs and fees for services that provided no value to them and resulted in a reduction of compounded return gains.**

124.    Mutual funds charge investors manager fees (typically ranging from 0.5%/yr to 1%/yr) that ostensibly pay for the premium of skilled human managers choosing investments and allocations that are meant to perform better than their benchmarks.  The funds also pay costs that are incurred because of their active turnover of investments (ranging per U.S. Securities and Exchange Commission (SEC) from 1%/yr to 1.5%/yr).

125.     Unlike mutual funds with human managers, passive or index funds have no manager fees and dramatically lower transaction/turnover costs to detract from the funds' performance.

126.     The Restatement of Trusts (Third) explains that a plan fiduciary must not only benchmark the fees of actively managed funds but also identify the additional costs that result from the use of actively managed funds. It is necessary to identify these costs so that the plan sponsor can determine whether the additional costs are justified by a reasonable expectation of additional returns.

127.     Accordingly, in order to justify investment in actively managed funds, there must be a reasonable expectation that those funds can actually perform better than their benchmark.  In other words, the fund managers must demonstrate skill in beating the relevant part of the market to justify fees and costs of active management, otherwise a prudent investor should simply buy the benchmark.

128.     This statistical concept is fundamental and considers a principal tenet of investing that more risk must be justified by higher potential returns while less risk may be met with lesser returns. Indeed, the Restatements of Trust (Second and Third) discuss why Treasury bills and notes are bought by older investors – less yield, but less risk too for someone with little time to recover losses. When the higher level of risk fails to achieve a commensurate level of higher return, the investment cannot be prudent.

129.     That is, "[i]f the extra costs and risks of an investment program are substantial, these added costs and risks must be justified by realistically evaluated return expectations." Restatement (Third) of Trusts § 90, cmt. H(2).  In the investment industry, this comparison must be made by comparing the performance of actively managed funds to the performance of broad market indexes and index fund alternatives. The use of actively managed funds is justified only when the additional expected returns sufficiently exceed the additional costs.

130.    Many studies have shown that while higher-cost mutual funds may over the short term outperform a less-expensive option, such as a passively managed index fund, they rarely do so over an extended period of time.

131.    Here, as reflected in the table below showing exemplars of the relative expense of certain Plan funds and comparable index funds, the Plan incurred substantial excess expense by offering mutual funds with high fees.

**Table 8**

**Excess Expense from Expensive and Actively Managed Funds**

| Current Fund | Expense | Comparable Index Fund | Expense | Excess Expense % |
|---|---|---|---|---|
| Hartford Core Equity R4 | 0.76 | Fidelity 500 Index (in Plan) | 0.015 | 5067% |
| MFS Growth R3 | 0.84 | Vanguard Growth Index Adm | 0.05 | 1680% |
| JPMorgan Equity Income R3 | 0.96 | Vanguard Value Index Adm | 0.05 | 1920% |
| Harford MidCap R4 | 1.15 | Vanguard Mid-Cap Growth Index Adm | 0.07 | 1643% |
| Victory Sycamore Established Value A | 0.90 | Vanguard Mid-Cap Value Index Adm | 0.07 | 1286% |
| Loomis Sayles Small Cap Growth Retail | 1.17 | Vanguard Small Cap Growth Index Adm | 0.07 | 1671% |
| Victory Sycamore Small Company Op A | 1.24 | Vanguard Small Cap Value Index Adm | 0.07 | 1771% |
| Clearbridge International Growth A | 1.06 | Vanguard Intl Div Apprec Index Adm | 0.16 | 663% |
| Invesco Developing Markets A | 1.20 | Vanguard Emerging Mkts Index Adm | 0.14 | 857% |
| American Funds New Perspective R4 | 0.76 | Vanguard Total World Stock Index Adm | 0.10 | 760% |
| Cohen & Steers Real Estate Securities A | 1.13 | Vanguard Real Estate Index Adm | 0.12 | 942% |
| PGIM Total Return Bond A | 0.76 | Fidelity US Bond Index (in Plan) | 0.025 | 3040% |
| American Funds American Balanced R4 | 0.60 | Vanguard Balanced Index Adm | 0.07 | 857% |

132.    Incurring these excess expenses for investment in active funds can only be justified if the returns from these actively managed funds justify the cost of their fees.

133.    Plaintiffs have compared the Plan's actively managed fund offerings and passive offerings with high fees to passively managed funds invested in the same asset class and with lower fees – a standard industry practice for evaluating mutual funds.

134.    Logically, if an actively managed mutual fund cannot beat its applicable benchmark(s), it is better for investors to simply "buy the benchmark" by investing in a low-cost index fund, which is more likely to outperform the actively managed funds over time.

135.    The chart below demonstrates that almost all of these funds could have been replaced with comparable index funds with lesser fees and better overall performance.

**Table 9**

**Cost of Active Management/High Fee Funds v. Comparable Index Alternatives (IA)**

| Fund Name | Comparable IA Fund Name | +/- IA during SOL Period[1] | Cost to Participants during SOL Period[2] |
|---|---|---|---|
| Columbia Large Cap Index A | Fidelity 500 index | (1.03) | ($21,658.31) |
| Columbia Contrarian Core A | Fidelity 500 index | (6.18) | ($286,571.29) |
| Hartford Core Equity R4 | Fidelity 500 index | (5.44) | ($299,209.31) |
| MFS Growth R3 | TIAA-CREF Large-Cap Growth Index Inst | (14.17) | ($1,100,337.50) |
| Invesco Diversified Dividend R | Vanguard Value Index Adm | (11.46) | ($728,311.25) |
| JPMorgan Equity Income R3 | Vanguard Value Index Adm | (0.30) | ($20,048.03) |
| Columbia Mid Cap Index A | Fidelity Mid Cap Index | (5.45) | ($99,622.05) |
| Hartford MidCap R4 | Vanguard Mid-Cap Growth Index Adm | (18.51) | ($242,017.53) |
| Victory Sycamore Established Value A | Vanguard Mid-Cap Value Index Adm | 24.02 | $423,331.42 |
| Columbia Small Cap Index A | Fidelity Small Cap Index | 1.92 | $16,334.64 |
| Loomis Sayles Small Cap Growth Retail | Vanguard Small Cap Growth Index Adm | 24.48 | $270,526.84 |
| Victory Sycamore Small Company Opp A | Vanguard Small Cap Value Index Adm | 8.70 | $105,877.91 |
| T. Rowe Price International Eq Index | Fidelity International Index | (0.75) | ($7,255.62) |
| American Funds Europacific Growth R3 | Vanguard International Growth Adm | (14.99) | ($649,889.17) |
| American Funds Europacific Growth R4 | Vanguard International Growth Adm | (4.51) | ($232,161.49) |
| Clearbridge International Growth A | Vanguard International Growth Adm | (29.40) | ($1,962,519.21) |

| | | | |
|---|---|---|---|
| Invesco Developing Markets A^ | Vanguard Emerging Markets Stock Index Adm | (14.42) | ($119,221.62) |
| Dreyfus Bond Market Index Inv^ | Fidelity US Bond Index | (0.31) | ($3,563.12) |
| American Funds American Balanced R3 | Vanguard Balanced Index Adm | 0.92 | $28,048.31 |
| American Funds American Balanced R4 | Vanguard Balanced Index Adm | (0.28) | ($8,990.29) |
| American Century One Choice In Retire R | BlackRock LifePath Index Retire K | (1.17) | ($37,252.13) |
| American Century One Choice In Retire A | BlackRock LifePath Index Retire K | (0.89) | ($31,875.82) |
| American Century One Choice 2025 R | BlackRock LifePath Index 2025 K | (2.72) | ($251,088.10) |
| American Century One Choice 2025 A | BlackRock LifePath Index 2025 K | (0.41) | ($46,987.76) |
| American Century One Choice 2030 R | BlackRock LifePath® Index 2030 K | (3.41) | ($339,976.25) |
| American Century One Choice 2030 A | BlackRock LifePath® Index 2030 K | (0.22) | ($28,776.06) |
| American Century One Choice 2035 R | BlackRock LifePath® Index 2035 K | (4.16) | ($447,970.76) |
| American Century One Choice 2035 A | BlackRock LifePath® Index 2035 K | 0.02 | $3,188.25 |
| American Century One Choice 2040 R | BlackRock LifePath® Index 2040 K | (4.46) | ($404,168.19) |
| American Century One Choice 2040 A | BlackRock LifePath® Index 2040 K | 0.31 | $38,347.82 |
| American Century One Choice 2045 R | BlackRock LifePath® Index 2045 K | (4.16) | ($384,641.88) |
| American Century One Choice 2045 A | BlackRock LifePath® Index 2045 K | 0.12 | $14,941.70 |
| American Century One Choice 2050 R | BlackRock LifePath® Index 2050 K | (3.53) | ($234,469.66) |
| American Century One Choice 2050 A | BlackRock LifePath® Index 2050 K | (0.06) | ($6,122.96) |
| American Century One Choice 2055 R | BlackRock LifePath® Index 2055 K | (3.07) | ($53,507.24) |
| American Century One Choice 2055 A | BlackRock LifePath® Index 2055 K | (0.42) | ($12,968.32) |
| American Century One Choice 2060 R | BlackRock LifePath® Index 2060 K | (2.83) | ($973.24) |
| American Century One Choice 2060 A | BlackRock LifePath® Index 2060 K | (0.60) | ($1,068.57) |

1) Beginning period is 2017 or the first year the fund was listed in the Form 5500 Schedule of assets, if later. Ending year based on last full year in the plan

2) Based on 2017 beginning year assets or the year the fund was added, if later.

136.    The comparators used in the chart above are appropriate because they, *inter alia*, are widely available and reputable funds, have the same investment goals as their comparator funds, and select stocks out of the same pool of investments.  The comparators would be used by Plan participants looking to make the same kinds of investments.

137.    In this regard, as discussed above, funds select a primary prospectus benchmark (PPBM) for performance comparisons.  Morningstar also selects an asset-class specific category index (MCI) for each fund.

138.    The passive funds selected by Plaintiffs for comparison are appropriate comparators to the active funds because they could both properly be benchmarked against the same broad-based market index comparators and are compared by Morningstar to the same category index.

139.    With respect to the American Century One Choice Target Date Funds, it is unquestionably the case that they could and should have been replaced by a low-fee index fund-based alternative because that is precisely what happened.  After years of causing the Plan's participants to overpay for management fees and suffer from significant underperformance, the Defendants replaced these funds with the BlackRock LifePath Index Target Date Funds, which principally invest in underlying index-based funds to reduce fees.

140.    However, Defendants failed to invest in the cheapest share class of the BlackRock Lifepath funds, causing the fund to pay further unnecessary fees thus negating one of the chief benefits of passive investing.

141.    Likewise, the Columbia Large Cap Index A fund is clearly appropriately compared to the Fidelity 500 Index because it was replaced in the Plan with the Fidelity 500 Index option in 2019.

142.    Similarly, the Dreyfus Bond Market Index Inv fund is appropriately compared to the Fidelity US Bond Index fund because Defendants replaced the Dreyfus fund with the passive comparator in 2019.

143.    The fact that Defendants replaced some funds with the index comparators serves to underscore the appropriateness of Plaintiffs' other comparisons made using the same methodology.

144.    Consideration of the Columbia Large Cap Index A fund comparator helps to further illustrate the aptness of Plaintiffs' comparisons.

145.    The Columbia Large Cap Index A "[a]ims to deliver investment results that match the S&P 500 Index."[7]

146.    Its PPBM and BFI is the S&P 500 Index and its MCI is the Russell 1000 TR.

147.    The Fidelity 500 Index, to which Plaintiffs compare it and by which it was replaced, is likewise designed to track the S&P 500 and its MCI is also the Russell 1000 TR.  At the time of selection in or around 2012, Columbia charged, and continues to charge, 0.45% for the exact same investment as the Fidelity option that cost just 0.04% in 2012 and costs just 0.015% now.

148.    Defendants should never have selected the grossly more expensive option or should have removed it from the Plan sooner to avoid costing the Plan excess fees.

149.    Similarly, Plaintiffs compare the Columbia Contrarian Core A and Hartford Core Equity R4 fund (with which it was replaced) to the Fidelity 500 Index fund.  Both the actively managed funds and the passively managed comparator all have an MCI of the Russell 1000 TR as does the Fidelity 500 index fund.

150.    By way of further example, the MFS Growth R3's PPBM and MCI is the Russell 1000 Growth TR.

151.    Plaintiffs have selected the TIAA-CREF Large-Cap Growth Index fund as its passive comparator because it seeks to track the same Russell 1000 Growth TR index.

152.    So too, with respect to the Invesco Diversified Dividend R3 and JPMorgan Equity Income R3 fund (with which it was replaced), Plaintiffs compare them to the Vanguard Value Index Adm fund which also has the Russell 1000 Value TR as their Morningstar Category Index.

---

[7] https://www.columbiathreadneedleus.com/investment-products/mutual-funds/Columbia-Large-Cap-Index-Fund/Class-Class%20A/details/?cusip=19765H339t

153.    The same holds true for all of the comparisons as demonstrated in the chart below. Indeed, Plaintiffs have calculated the correlation of holdings between the plan funds, the cheaper index alternatives and the Morningstar Category Index and have determined that there is an extremely high level of correlation, reflecting that the MCI is an appropriate benchmark and the comparator funds are very similar investment vehicles but for the fee differentials.

**Table 10**

| Actively Managed Fund in Plan | Index Alternative | Shared MCI | Correlation to Index Alternative and MCI |
|---|---|---|---|
| Columbia Large Cap Index A | Fidelity 500 Index | Russell 1000 TR USD | Since its inception, Columbia has a perfect 1.00 correlation to both the Fidelity 500 Index and Russell 1000 TR |
| Columbia Contrarian Core A | Fidelity 500 Index | Russell 1000 TR USD | Since its inception, Columbia has a correlation of 0.97 relative to both Fidelity 500 Index and Russell 1000 TR |
| Hartford Core Equity R4 | Fidelity 500 Index | Russell 1000 TR USD | Since its inception, Hartford has correlations of 0.98 and 0.99 relative to Fidelity 500 Index and Russell 1000 TR, respectively |
| MFS Growth R3 | TIAA-CREF Large-Cap Growth Index Inst | Russell 1000 Growth TR USD | Since its inception, MFS has a correlation of 0.97 relative to both TIAA-CREF Large Cap Growth Index and Russell 1000 Growth TR |
| Invesco Diversified Dividend R3 | Vanguard Value Index Adm | Russell 1000 Value TR USD | Since its inception, Invesco has a correlation of 0.97 relative to both Vanguard Value Index and Russell 1000 Value TR |
| JPMorgan Equity Income R3 fund | Vanguard Value Index Adm | Russell 1000 Value TR USD | Since its inception, JPMorgan has a correlation of 0.99 relative to both Vanguard Value Index and Russell 1000 Value TR |
| Columbia Mid Cap Index A | Fidelity Mid Cap Index | Russell Mid Cap TR USD | Since its inception, Columbia has a correlation of 0.99 relative to the Russell Mid Cap TR and 0.99 relative to Fidelity Mid Cap Index in the ten-year period (Fidelity inception date was 9/8/2011) |
| Hartford MidCap R4 | Vanguard Mid-Cap Growth Index Adm | Russell Mid Cap Growth TR USD | Since its inception, Hartford has a correlation of 0.97 relative to the Russell Mid Cap Growth TR and 0.96 relative to Vanguard Mid-Cap Growth Index in the ten-year period (Vanguard inception date was 9/27/2011) |

| | | | |
|---|---|---|---|
| Victory Sycamore Established Value A | Vanguard Mid-Cap Value Index Adm | Russell Mid Cap Value TR USD | Since its inception, Victory has a correlation of 0.98 relative to the Russell Mid Cap Value TR and 0.98 relative to Vanguard Mid-Cap Value Index in the ten-year period (Vanguard inception date was 9/27/2011) |
| Columbia Small Cap Index A | Fidelity Small Cap Index | Russell 2000 TR USD | Since its inception, Columbia has a correlation of 0.99 relative to the Russell 2000 TR and 0.99 relative to Fidelity Small Cap Index in the ten-year period (Fidelity inception date was 9/8/2011) |
| Loomis Sayles Small Cap Growth Retail | Vanguard Small Cap Growth Index Adm | Russell 2000 Growth TR USD | Since its inception, Loomis Sayles has a correlation of 0.94 relative to the Russell 2000 Growth TR and 0.97 relative to Vanguard Small Cap Growth Index in the ten-year period (Vanguard inception date was 9/27/2011) |
| Victory Sycamore Small Company Opp A | Vanguard Small Cap Value Index Adm | Russell 2000 Value TR USD | Since its inception, Victory has a correlation of 0.97 relative to both Vanguard Small Cap Value Index and Russell 2000 Value TR |
| T. Rowe Price International Eq Index | Fidelity International Index | MSCI ACWI Ex USA NR USD | Since its inception, T. Rowe Price has correlations of 1.00 and 0.98 relative to Fidelity International Index and MSCI ACWI Ex USA, respectively |
| American Funds Europacific Growth R3/R4 | Vanguard International Growth Adm | MSCI ACWI Ex USA Growth NR USD | Since its inception, American Funds has correlations of 0.97 and 0.98 relative to Vanguard International Growth and MSCI ACWI Ex USA Growth, respectively |
| Clearbridge International Growth A | Vanguard International Growth Adm | MSCI ACWI Ex USA Growth NR USD | Since its inception, ClearBridge has correlations of 0.88 and 0.89 relative to Vanguard International Growth and MSCI ACWI Ex USA Growth, respectively |
| Invesco Developing Markets A^ | Vanguard Emerging Markets Stock Index Adm | MSCI EM NR USD | Since its inception, Invesco has a correlation of 0.95 relative to Vanguard Emerging Mkts Stock Idx and 0.97 relative to MSCI EM NR in the 20-year period |
| Dreyfus Bond Market Index Inv^ | Fidelity US Bond Index | Bloomberg US Agg Bond TR USD | Since its inception, Dreyfus has correlations of 0.99 and 1.00 relative to Fidelity US Bond Index and Bloomberg US Agg Bond TR, respectively |
| American Funds American Balanced R3/R4 | Vanguard Balanced Index Adm | Morningstar Mod Tgt Risk TR USD | Since its inception, American Funds has correlations of 0.98 and 0.97 relative to Vanguard Balanced Index and Morningstar Mod Tgt Risk TR, respectively |

| American Century One Choice Target Date Funds | BlackRock LifePath Index [Target Year] K | Morningstar Lifetime Mod [Target Year] TR | Since their inception, all American Century target date funds except for In Retirement have correlations of 0.99 relative to their respective Morningstar Lifetime Moderate target date comparators and 0.99 relative to the respective BlackRock LifePath target date comparators over the ten-year period or earliest available. In retirement's correlation is 0.97 and 0.98, respectively |

*Correlations range from -1.0 (perfect negative correlation) to +1.0 (perfect positive correlation) with 0.0 indicating no correlation. Statistically, a correlation coefficient (r) between +0.76 and +1.0 are considered to have a high degree of positive correlation*

154.     Defendants may argue that the index funds are not appropriate comparators because they do not invest in precisely the same manner as the active funds, but that is precisely the point. The Plan's active fund investment strategy only makes sense if the active funds are outperforming their comparators when considering the cost of the active funds, particularly given the high correlation in holdings between the active funds and index funds.

155.     Further, if minute variations in fund composition were sufficient to render comparisons inappropriate, then no two funds could be compared whether or not they are actively managed because each fund manager will invest slightly differently.

156.     As shown above, the active funds have almost entirely failed to outperform their passive index comparators and the strategy to invest in those funds was not prudent.

157.     Defendants' failure to engage in appropriate prudent selection and retention decision-making processes is further evidenced by the fact that Defendants did not invest the actively managed funds discussed above in the best share class that was available to the Plan for those funds, costing Plan participants additional fees on top of the ordinary active fund management fees.

158.     Thus, as demonstrated above, even if offering actively managed funds can be justified in some instances, here it was not justified by Defendants' specific Plan investment choices.

159.     Finally, many of these funds did not merely trail passively managed options but also trailed their benchmarks as discussed in more detail in the section above.

160.     Defendants had a duty to prudently select funds and not to chase excess returns which were not justified by the performance of the funds at the time of their selection or thereafter. Defendants had a duty to seek out lower cost comparable funds than those that they offered when the excess costs were not justified by increased returns.

161.     Defendants were aware of or should have been aware of the performance discussed above and had a duty to make appropriate selection decisions and *actively cull expensive underperforming funds* whose continued inclusion in the Plan could not be justified and which were costing Plan participants excess fees that were not justified by performance.

162.     During the Class Period, Defendants failed to consider and monitor materially similar but cheaper alternatives to the Plan's investment options.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

163.     Defendants breached their duties and continue to do so by failing to remove mutual funds which charge fees that are not justified by their performance.

**E.     Defendants Imprudently Maintained the Plan's Investment in the Wilmington/MetLife Group Annuity Contract Stable Value Option, When Lower Share Classes Existed and Other Investment Vendor Offered Superior Alternatives.**

164.     In 2017 and 2018 the Defendants offered the Wilmington/MetLife 80 Annuity as their Stable Value Option (WT CIT III for Metlife GAC 25554 CL 80)

165.     In 2019 through 2022 they offered the Wilmington/MetLife 50 Annuity (WT CIT III for Metlife GAC 25554 CL 50)

166.     Stable value funds are not SEC registered mutual funds. Single Company fixed annuity contracts that are structured as an insurance company general account, or an insurance company separate account, are solely regulated by the State Insurance Commissioner selected by the insurance company. Synthetic based stable value funds are run by a Registered Investment Advisor (RIA) regulated by the SEC but use a small amount of synthetic GIC's which sometimes

are state regulated. The differences between the different types of funds are critical from a fiduciary standpoint.  Both Wilmington/Metlife versions were insurance company separate account.

167.    A stable value account in a retirement plan is (i) similar to a money market fund in that it provides principal protection, and (ii) similar to a bond fund in that it provides higher consistent returns over time. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value. Synthetic Stable value accounts "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds.[8] Single fixed annuity contracts are set by the insurance company at their discretion which typically maximizes profit to the insurance company and minimizes returns to participants which is a fiduciary breach.

168.    The 401(k) marketplace for the largest plans, if they offer stable value funds, offer "synthetic" stable value funds, which are the least risky, because the fund owns the securities in the underlying funds which typically are 95%+ of the funds value. The annuity part or wrap is not only typically divided between insurers but only typically comprises 1-5% of the value at risk.

169.    While the majority of plans the size of LHC use a lower risk synthetic stable value product, there are still some Separate Account and General Account products.

170.    Separate account products, such as the Wilmington/MetLife, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because they are not owned by the Plan but sit on the balance sheet of the insurer where they take on near 100% of the single entity credit and liquidity risk of MetLife.

---

[8] *See* Stable Value Fund v. Money Market Fund, Financial Web describing difference between stable value funds and money market funds), available at:
http://www.finweb.com/investing/stable-value-fund-vs-money-marketfund.
html#axzz44EaLfQnQ

171.    In recent years, large 401(k) plans fled fixed annuity products backed by the general account of a single insurance company due to concerns about single entity credit and liquidity risk. Following the high-profile default failures of GIC Issuers in 1992 and 1993 by Executive and Confederation Life, the Federal Reserve expressed concerns about the high risk of the insurance company general account products and the flimsy nature of the state guarantees backing the insurance contracts. The industry immediately responded by offering more separate account contracts, which put creditors in line ahead of general account contracts but still resulted in 100% single entity credit and liquidity exposure. Synthetic value was created in 1995 and by 1999 most the largest plans were in a synthetic based stable value fund. Synthetic Stable value continued to gain market share over the next 20 years going into smaller and smaller plans. Some general account and separate accounts have existed in plans under $1 billion because of a lack of litigation until recently.

172.    In September 2010 the trade group for State Government 401(k) plans, the National Association of Government Defined Contribution Administrators, (NAGDCA), created a brochure with the following characterization of insurance company general account stable value funds. "Due to the fact that the plan sponsor does not own the underlying investments, the portfolio holdings, performance, risk, and management fees are generally not disclosed. This limits the ability of plan sponsors to compare returns with other SVFs [stable-value funds]. It also makes it nearly impossible for plan sponsors to know the fees (which can be increased without disclosure) paid by participants in these funds—a critical component of a fiduciary's responsibility.

173.    In this case, LHC placed the proceeds of the stable value fund in an insurance company separate account at MetLife. MetLife received spread fees – the difference between the returns made by MetLife on the assets in the segregated account and the crediting rate paid to participants. Insurance company balance sheets allow leverage and have tax advantages that add to profits and return.

174.    An insurance company GIC, such as the MetLife GIC here, is subject to the single entity credit risk of the insurance company that issues the contract. The crediting rate, set in

advance by the insurance company and reset from time to time in its sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest. Thus, Defendants had the opportunity and duty to evaluate the investment in advance; this is not a case of judging an investment with the benefit of hindsight. Further, Defendants should have specifically negotiated in the contract that MetLife was a fiduciary and that it could exit at no costs if MetLife was downgraded for any reason. The single entity annuity contract constrained liquidity and the ability to replace it without incurring exit charges.

175.     In fact, there is substantial liquidity risk because there is no outside market for these contracts.

176.     Additionally, MetLife has full control over the GIC's spread fees and thus has the ability to set (and manipulate) crediting rates.

177.     As of 2022, the MetLife GIC had $12,936,493 of assets for which MetLife charged an "administrative fee" plus earned an undisclosed "spread."

178.     Defendants did not have a viable methodology for monitoring the costs or performance of the MetLife GIC. Not only were comparable products available from other providers with higher crediting rates, but identical or substantially identical products were available to Defendants from MetLife and other stable value providers with higher crediting rates and lower spread fees.

179.     As an ERISA fiduciary, Defendants had an obligation to monitor the fees and performance of the GIC and to remove or replace it where a substantially identical investment option can be obtained from the same provider at a lower cost. *See, e.g.*, *Tibble v. Edison Int'l*, 843 F.3d at 1198 ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected.").

180.     While the most prudent choice would be for LHC to move to a low-cost lower risk synthetic GIC structure – they could have done substantially better for participants with other

substantially identical risky insurance separate account products.  While we do not have detailed performance over the entire class period current net crediting rate or yield is an excellent proxy.

181.    The WT MetLife GAC products 80 used in 2017-2018 and 50 used in 2019-2022 corresponds to the amount of kickbacks or revenue sharing.  As the 9/30/22 yield of the 80 product was 1.30% and 1.60% for the 50 products.  Like a share class violation they could have been in the WT MetLife GAC 25 which had a yield of 1.85%.

182.     In addition there are substantially similar risky insurance separate account products such as some from Mass Mutual with over double the return of 4% and higher which are far more cost efficient.

183.    Defendants breached their fiduciary duty by offering the unnecessarily risky WT MetLife GAC product and by offering a share class that did not maximize Plan Participants' returns.

## CLASS ACTION ALLEGATIONS

184.    Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

185.    All participants in or beneficiaries of the LHC GROUP 401(K) PLAN from six years prior to the filing of the complaint in this matter through the date of judgment (the "Class Period").

186.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Plan has over 40,000 participants with account balances.

187.    Questions of law and fact common to the members of the Class predominate over questions that may affect individual class members, including, *inter alia*:

(a) whether Defendants are fiduciaries of the Plan;

(b) whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

(c) whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d) whether Defendants breached their duty to monitor other fiduciaries of the Plan; and

(e) the extent of damage sustained by Class members and the appropriate measure of damages.

188. Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

189. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

190. Plaintiffs have no interests that conflict with those of the Class. Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

191. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

## <u>FIRST CAUSE OF ACTION</u>

### Breach of Fiduciary Duty of Prudence

### (Against All Defendants)

192. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

193. Defendants were fiduciaries of the Plan under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and

monitoring of investment options for the Plan, and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

194.    As a fiduciary of the Plan, Defendants were required, pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

195.    Common law and ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

196.    As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants selected and retained investment options in the Plan despite their high cost and poor performance relative to other comparable investments and failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

197.    In addition, Defendants failed to monitor or control excessive

47

compensation paid for recordkeeping services which resulted from the unnecessary payment of recordkeeping and other services both directly and as a percentage of assets.

198.    In addition, Defendants failed to monitor or control excessive compensation paid for shareholder or financial advising services which resulted from the unnecessary payment of those services as a percentage of assets.

199.    Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

200.    As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.

## <u>SECOND CAUSE OF ACTION</u>

**Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers**

**(Against All Defendants)**

201.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

202.    Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

48

203.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

204.    Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

205.    Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

(b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiffs and members of the Class; and

(c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings;

(d) failing to institute competitive bidding for covered service providers.

206.    As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiffs, and members of the Class suffered millions of dollars of losses. Had Defendant

complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

207.    Pursuant to ERISA § 502(a)(2) and (a)(3), and ERISA § 409(a), 29 U.S.C. § 1132(a)(2) and (a)(3), and 29 U.S.C. § 1109(a), Defendant is liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

<h3 style="text-align:center"><u>PRAYER FOR RELIEF</u></h3>

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Christina Humphrey Law, P.C. and Tower Legal Group, P.C. and Law Office of Kenneth Starcher as Class Counsel;

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

- Order equitable restitution against Defendants;

- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE BY LAW.**

Dated: January 20, 2023          **LAW OFFICE OF KENNETH STARCHER**
**CHRISTINA HUMPHREY LAW, P.C.**
**TOWER LEGAL GROUP, P.C.**

By:      */s/ Kenneth R. Starcher*
Kenneth R. Starcher (WVSB #10174)
**LAW OFFICE OF KENNETH STARCHER**
723 Kanawha Blvd E, Ste 200
Charleston, WV  25301
Telephone: (304) 541-9120
Email: krstarcher2@gmail.com

Christina A. Humphrey (*\*PHV pending*)
Robert N. Fisher  (*\*PHV pending*)
**CHRISTINA HUMPHREY LAW, P.C.**
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924

51

Facsimile: (805) 618-2939
Email: christina@chumphreylaw.com
Email: rob@chumphrelaw.com

James A. Clark *(\*PHV pending)*
Renee P. Ortega *(\*PHV pending)*
**TOWER LEGAL GROUP, P.C.**
11335 Gold Express Drive, Ste. 105
Sacramento, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.ortega@towerlegalgroup.com